OPINION
Third party defendants-appellants, Roy I. Miller and West Shell, Inc., appeal from a decision of the Butler County Court of Common Pleas finding in favor of Defendant/Third party plaintiff-appellee, Carolyn Ondrovich, in an intentional infliction of emotional distress action.
On October 13, 1994, appellee executed a real estate contract for the sale of her home located at 661 Ross Avenue in Hamilton, Ohio to plaintiff, Deborah Wilkins ("Wilkins"). However, appellee subsequently refused to close the sale, prompting Wilkins to file a lawsuit for specific performance and damages. Appellee then brought suit against appellants seeking damages for intentional infliction of emotional distress.
Following a divorce, appellee listed her property for sale with several realtors, including Roy I. Miller ("Miller"), who is associated with West Shell, Inc. ("West Shell"). Miller's wife, Debbie, who is also a realtor associated with West Shell, was involved with appellee's listing and communicated with appellee, showed the property to potential purchasers, and presented offers to appellee. It is undisputed that appellee's fifteen-year-old son, Jeramie, did not want the house sold.
On approximately October 11, 1994, Debbie Miller telephoned appellee and informed her that Wilkins had submitted an offer to purchase appellee's home for $50,000. During that conversation, Jeramie yelled to appellee a statement to the effect that he did not want "any more bitches [to] come through the house." Unbeknownst to appellee, Debbie Miller overheard Jeramie's comment.[1] Debbie Miller testified that she believed that appellee's son, Jeramie, had called her a name and threatened her. Debbie Miller stated that she informed Miller of the comment and he agreed to handle any further negotiations with appellee.
Appellee did not accept Wilkins' $50,000 offer and several counteroffers were exchanged between the parties, culminating in appellee's verbal agreement to sell the property to Wilkins for $56,900. On October 13, 1994, when Miller telephoned appellee to schedule an appointment for appellee to sign the contract of sale, he asked to speak to Jeramie. According to Jeramie, Miller screamed at him and told him that he was upset that Jeramie had referred to his wife as a "bitch" and told him to meet Miller at a car wash on B Street. However, according to Miller, he simply explained to Jeramie that his mother had agreed to sell the house and that he would be over with some paperwork for her to sign.
Shortly after the October 13, 1994 telephone conversation, Miller arrived at appellee's home and knocked on the door. According to appellee and Jeramie, when appellee opened the door, Miller stepped around appellee and confronted Jeramie, saying something similar to "I don't care that you are just fifteen years old, I am going to whip you and I want you to meet me down at the car wash on B Street" and "you call my wife another name and I'll fix you." Jeramie began yelling and arguing with Miller to the point where appellee testified that she had to physically place herself between Jeramie and Miller in order to keep the two from fighting.
At that point, appellee directed Miller to the dining room table where he opened his briefcase and began going over paperwork with appellee while he and Jeramie continued to yell and scream at each other. Appellee testified that she began crying and pleaded with Jeramie and Miller to stop arguing but they continued. Appellee stated that she asked Miller to leave the paperwork so she could review the terms and return them to him the following day, but Miller told her the papers had to be signed that evening. Thus, in order to get Miller to leave, appellee testified that she hurriedly signed the papers without reading them.
According to Miller, when he arrived at appellee's home, Jeramie confronted him and began yelling at him. Miller testified that he did not respond to Jeramie by yelling, but simply went about his business with appellee. Miller stated that appellee was upset because she was trying to calm down Jeramie and that he did not verbally argue or fight with Jeramie that evening.
Following discovery, Wilkins, Miller and West Shell filed motions for summary judgment. The trial court granted Wilkins' motion for summary judgment on her claim for specific performance and reserved the issue of damages for trial. The trial court denied the motion for summary judgment filed by Miller and West Shell. On February 16, 1996, the matter was tried to the bench, after which the trial court dismissed Wilkins' claim for damages and found in favor of appellee against Miller and West Shell on her claim of intentional infliction of emotional distress. The trial court awarded appellee compensatory damages in the amount of $3,500 and punitive damages in the amount of $15,000. It is from this order of judgment that appellants now appeal, setting forth the following assignments of error:
Assignment of Error No. 1:
 THE TRIAL COURT ERRED IN FINDING THAT APPELLEE ESTABLISHED ALL OF THE ELEMENTS OF HER CLAIM FOR INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS.
Assignment of Error No. 2:
 THE TRIAL COURT ERRED IN AWARDING APPELLEE PUNITIVE DAMAGES.
In their first assignment of error, appellants contend that the trial court erred in finding that appellee established all of the elements of intentional infliction of emotional distress. Appellants argue that appellee failed to prove that Miller's conduct was extreme and outrageous such that it went "beyond all possible bounds of decency" and would be considered "utterly intolerable in a civilized community." Appellants also argue that appellee failed to prove that she suffered serious mental anguish of a nature that "no reasonable man could be expected to endure," and that Miller's actions were the proximate cause of her psychic injury.
When some competent, credible evidence exists to support the judgment rendered by the trial court, an appellate court may not overturn that decision unless it is against the manifest weight of the evidence. Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77,80; C.E. Morris Co. v. Foley Constr. Co. (1978),54 Ohio St.2d 279, 280. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." Seasons Coal at 80.
Intentional infliction of emotional distress occurs where "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another * * *." Yeager v. Local Union 20 (1983), 6 Ohio St.3d 369, 374, quoting Restatement of the Law 2d, Torts (1965) 71, Section 46(1). In order for a plaintiff to recover in an action for intentional infliction of emotional distress, plaintiff must establish the following four elements:
 (1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff;
 (2) that the actor's conduct was so extreme and outrageous as to go "beyond all possible bounds of decency" and was such that it can be considered as "utterly intolerable in a civilized community," Restatement of the Law 2d, Torts (1965) 73, Section 46, comment d;
 (3) that the actor's actions were the proximate cause of plaintiff's psychic injury; and
 (4) that the mental anguish suffered by plaintiff is serious and of a nature that "no reasonable man could be expected to endure it," Restatement of the Law 2d, Torts (1965) 77, Section 46, comment j.
Pyle v. Pyle (1983), 11 Ohio App.3d 31, 34.
In defining "extreme and outrageous" conduct, the supreme court has stated:
 It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by `malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, `Outrageous!'
 The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam * * *.
Yeager, 6 Ohio St.3d at 374-375 (citations omitted).
While expert medical testimony may be offered to support a claim of serious emotional distress, "expert opinion is not indispensable." Uebelacker v. Cincom Systems, Inc. (1988),48 Ohio App.3d 268, 276. In addition, "the determination of whether and to what extent the defendant's conduct caused the plaintiff serious emotional distress is for the trier of fact." Id.
Appellee testified that on October 13, 1994 when Miller called and asked to speak to Jeramie, she could see that the conversation with Miller was upsetting Jeramie and that Jeramie began cursing while on the telephone. Appellee stated that she took the telephone from Jeramie and asked Miller what was going on and that Miller replied that Debbie Miller informed him that Jeramie had called her a "bitch." Appellee stated that she apologized for Jeramie's behavior and thought that the controversy with Jeramie had ended.
Appellee testified that Miller arrived at her home shortly thereafter. When appellee opened the door for Miller, appellee testified that Miller stepped around her without even greeting her and immediately confronted Jeramie. Appellee stated that Miller told Jeramie that he was "going to whip" Jeramie, that if Jeramie called his wife another name he would "fix" Jeramie, and that Jeramie should meet him on B Street. Appellee stated that Jeramie replied that it was not necessary to go to B Street since they could go to a sidewalk in front of the house.
Appellee testified that she was very afraid when Miller began the altercation with Jeramie because Miller was much older than Jeramie, who was fifteen years old at that time. Appellee testified that she was afraid that Miller and Jeramie were going to fight and that one of them would be injured. Appellee also testified that she was dumbfounded and shocked that Miller, a businessman, would act in that manner. Appellee stated that Miller became very upset and that his face turned red prompting her to physically place her body between Miller and Jeramie in an attempt to prevent them from fighting.
Appellee stated that she was very upset and that she pleaded with Miller and Jeramie to stop arguing and fighting. Appellee stated that she broke down and began crying because Miller and Jeramie continued to yell and scream at each other and threaten each other. Appellee testified that she just wanted Miller to leave her home, but when she asked him to leave he refused, telling her that he had to have the papers signed that evening. Appellee testified that she felt that the only way she could get Miller to leave her home was to sign the real estate papers which Miller had placed in front of her. Therefore, appellee stated that she quickly signed the papers without reading them.
Appellee stated that after Miller left, she felt devastated and felt like a total failure. She felt that she had failed herself and her son and taken a chance on putting them out in the street by selling their home. Appellee felt that she had the right to make a counteroffer to the contract which Miller brought to her house but felt Miller did not "want to be bothered with [her]."
Appellee testified that she had talked with Miller's wife, Debbie, about her stormy and volatile relationship with both her son, Jeramie, and her ex-husband. Appellee testified that she also told Debbie Miller that she was seeing Dr. Alwis, a psychiatrist, for help with her problems. Appellee testified that she has been treating with Alwis for approximately four years for emotional problems. Appellee stated that after the October 13, 1994 incident, she discussed the matter quite a few times with Alwis. Appellee stated that she meets with Alwis on a regular basis, approximately once every two to three weeks.
Miller testified that on October 13, 1994, he asked to speak to Jeramie on the telephone because Jeramie was making comments in the background as he was going over the terms of the Wilkins' offer with appellee. Miller testified that he explained to Jeramie that appellee had agreed on the terms of a contract of sale, that he was going to come over and have appellee sign some paperwork, and that he was "just doing [his] job." Miller testified that when he arrived at appellee's house, he did not begin an altercation with Jeramie and that appellee did not step in between himself and Jeramie to prevent them from fighting. Miller stated that he did not yell at Jeramie, but Jeramie yelled at him. Miller stated that he did not threaten Jeramie and that appellee was upset only because she wanted Jeramie to calm down.
It was the trial court's opinion that the events which transpired on October 13, 1994 occurred as described by appellee and Jeramie. The trial court found that Miller's conduct that evening was both extreme and outrageous. The trial court found that Miller was involved in an altercation with Jeramie and that Miller threatened Jeramie by telling Jeramie to meet him on B Street. The trial court determined that Miller was in a fiduciary relationship with appellee and that appellee should have been able to trust and rely upon Miller.
The trial court also found that appellee has a "tender emotional threshold," is "easily distraught," and was emotionally distressed when she signed the contract for the sale of her property. The trial court also stated that Miller's behavior actually placed appellee under duress such that she felt that the only way to save her household and her son and rid herself of Miller was to sign the contract for the sale of her home. The trial court also found that Miller and his wife Debbie knew that appellee was divorced, knew of appellee's trouble with her ex-husband and son, and knew that she was being treated by a psychiatrist.
Based upon a thorough review of the record, we find that the record contains competent credible evidence to support the trial court's decision in this case. See Seasons Coal,10 Ohio St.3d at 80. The trial court found that appellee had established the elements required to support her claim of intentional infliction of emotional distress and we will not substitute our judgment for that of the trial court. See Seasons Coal at 80. Accordingly, appellants' first assignment of error is overruled.
In their second assignment of error, appellants contend that the trial court erred in awarding punitive damages to appellee. Punitive damages may be awarded in civil tort actions where actual damages have been proven and the defendant's actions demonstrate malice, fraud, oppression, or insult. Cabe v. Lunich (1994), 70 Ohio St.3d 598, 601; R.C. 2315.21(B). The "malice" which a defendant must possess to support an award of punitive damages is either "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." Malone v. Courtyard By Marriott Ltd. Partnership (1996), 74 Ohio St.3d 440, 445-446, quoting Preston v. Murty (1987), 32 Ohio St.3d 334, syllabus. Malice may be inferred from "reckless, wanton, willful or gross" behavior. Villela v. Waikem Motors, Inc. (1989), 45 Ohio St.3d 36, 37. Thus, extremely reckless conduct which demonstrates a conscious disregard for serious harm will support an award of punitive damages. Cabe, 70 Ohio St.3d at 601, quoting Preston,32 Ohio St.3d at 335.
Liability for punitive damages is decided by the trier of fact. Cabe, 70 Ohio St.3d at 601. Likewise, the amount of a punitive damage award rests within the sound discretion of the trier of fact, in this case the trial court. R.C. 2315.21(C)(2); Villela, 45 Ohio St.3d at 40.
The trial court awarded appellee $3,500 in compensatory damages and $15,000 in punitive damages. The trial court specifically found that Miller's behavior was extreme and outrageous. The trial court found that Miller was aware of appellee's tender emotional state, yet began an altercation with her son in her own home. The record also contains evidence that Miller's conduct caused appellee to sign a contract for the sale of her home for $56,900 when appellee testified that her home was worth approximately $74,000. In addition, the trial court stated that the contract for the sale of appellee's home only benefitted Miller since the sale of the home would entitle him to a commission.
After a careful review of the record, we find sufficient evidence in the record to support the trial court's award of punitive damages. The record contains evidence that Miller's conduct was, at the very least, extremely reckless evidencing a conscious disregard for serious harm to appellee. See Cabe at 601. Accordingly, appellants' second assignment of error is overruled.
Judgment affirmed.
WALSH, P.J., and YOUNG, J., concur.
[1] Jeramie testified that when he yelled the comment at his mother, he was not referring to Debbie Miller, he was referring to "the people who were trampling through the house, looking at it to buy." Debbie Miller testified that she overhead Jeramie say "If that God damn, fucking bitch comes over here, I'll kill her."