OPINION
Plaintiff-appellants, Mark J. Niessel and Jennifer Niessel, appeal from a Warren County Court of Common Pleas judgment granting summary judgment in favor of defendant-appellee, Meijer, Inc. ("Meijer").[1] The trial court's decision is affirmed in part, reversed in part, and remanded for further proceedings.
On December 9, 1998, Mr. Niessel was stopped by Middletown police shortly after shopping at the Meijer store located in Middletown. Looking for stolen Meijer merchandise, police officers searched Mr. Niessel and his vehicle, but no such merchandise was found. Subsequently appellants filed a lawsuit against Meijer, alleging false imprisonment, intentional infliction of emotional distress, negligent infliction of emotional distress, and loss of consortium. The Middletown Police Department was not joined as a party to the lawsuit.
After deposing Mr. Niessel, Meijer filed a motion for summary judgment. Subsequently, appellants' counsel deposed two Meijer employees and three members of the Middletown Police Department. The depositions filed for consideration of summary judgment included the following testimony:
Mr. Niessel testified that he went to Meijer to purchase a birthday gift for his sister. At the toy department, Mr. Niessel bought a bag designed to carry in-line skates. After making this purchase, Mr. Niessel went to the compact disc ("CD") section and found a C.D. that he also wanted to buy for his sister. He selected the C.D. and went to the front of the store to checkout. Mr. Niessel testified that when he saw that there were ten or twelve people standing in each checkout line, he returned to the counter in the toy department to see if he could pay for it there. Mr. Niessel testified that because no one was there to help him, he decided to return the C.D. to the place where he had found it and exited the store. As Mr. Niessel left, the greeter told him to have a nice day.
Mr. Niessel testified that he walked through the parking lot and got into his 1993 red Chevy Blazer. He backed out of his parking space and pulled out of the aisle. Mr. Niessel testified that he then stopped his vehicle and reached down to remove the receipt from the skate bag and put it in his wallet. Mr. Niessel left the parking lot, turned right and stopped at the second traffic light, waiting to turn left onto Route 122. After the traffic light turned green, Mr. Niessel made the turn and was immediately stopped by an officer of the Middletown Police Department. A second police officer parked in front of Mr. Niessel's vehicle.
Mr. Niessel testified that he was told to
 roll my window down, put my hands out the window, drop my keys, [and] open the door with my right hand keeping my left hand out of the window. And as soon as I stepped out of the door, both officers grabbed me and told me to put my hands on the vehicle.
Mr. Niessel put his hands on the vehicle, and the officers kicked his legs apart and frisked him. Mr. Niessel testified that he "felt like [he] was in a scene from Cops * * *." Mr. Niessel asked the officer "what this was all about" and an officer told Mr. Niessel that he was "suspected of shoplifting from Meijer's."
Mr. Niessel testified that he told the officer that he had purchased something from Meijer and that the bag was in his vehicle and the receipt was in his wallet. Mr. Niessel offered the officers his receipt and his identification. An officer went to the passenger side of Mr. Niessel's vehicle, opened the door, and retrieved the bag. After obtaining the bag, the officer searched Mr. Niessel's vehicle. In the meantime, a third Middletown police officer arrived. Mr. Niessel was told that he had to wait until the Meijer associates arrived before he would be free to leave. A fourth Middletown police officer stopped at the scene.
Mr. Niessel testified that when the Meijer associates finally arrived, one of them "high-fived" one of the police officers. Observing the woman's actions, Mr. Niessel believed that she was saying something like "we got him." Mr. Niessel began walking toward the Meijer associates because he was upset, but he was stopped by a police officer and told that he could not confront them. Mr. Niessel testified that he was agitated and wanted an apology.
Mr. Niessel testified that after the officers spoke with the Meijer associates, Mr. Niessel was asked for permission to search his vehicle again. The officer did not find anything during this search. Mr. Niessel asked whether Meijer was going to apologize. Mr. Niessel testified that the officer replied, "I can't tell you what Meijer's is going to do * * *, but as far as you're concerned, our business is done. I appreciate you being so cooperative. You're free to go." Mr. Niessel testified that he "got in my vehicle and left, went home shaking."
Mr. Niessel testified that the encounter lasted fifteen to twenty minutes and left him upset and irritated. According to Mr. Niessel, his wife stopped by Meijer the next day and spoke to the manager, who denied having any knowledge of the incident. Mr. Niessel testified that the manager said that he would talk to someone and contact Mrs. Niessel about it but never did.
Mr. Niessel testified that he was not receiving any mental health treatment for reasons related to the incident. Mr. Niessel admitted that he is able to continue his "normal day-to-day business" but stated that he avoids the city of Middletown. Mr. Niessel stated that he thinks about what happened "constantly." Mr. Niessel explained that each time it enters his mind, "I go through the entire incident from start to finish, and I feel the same way I did that day * * *." Mr. Niessel stated that he has been angry since the incident and that although he has not "snapped" he feels as if he is "on the edge." A few people in Mr. Niessel's life have told him that he should attend counseling, but Mr. Niessel has tried to "take care of these feelings * * * on my own terms and my own way." Mr. Niessel testified that the feels like he was "depants [sic] in front of six hundred people * * *."
Heather Anne Howison, Meijer's loss prevention manager at the time of the incident, was also deposed. Howison testified that she has been trained to look for suspicious behaviors in order to detect shoplifters. Howison testified that examples of suspicious behaviors included people dressing inappropriately for the weather, people carrying large purses, and people putting small items in their shopping cart and blocking these items with large items. Howison also testified, "If somebody comes in and goes right to a product, doesn't even look at a price or anything, and just grabs it up, that's not a norm."
Howison explained that she first observed Mr. Niessel on a black and white video that showed shoppers in the store. When asked what behavior she observed that raised suspicion about Mr. Niessel, Howison testified that the fact that he was carrying a large bag and his manner of selecting merchandise seemed suspicious. From watching the video, Howison could not determine whether the large bag Mr. Niessel was carrying was a Meijer bag or not. Howison testified that she "observed [Mr. Niessel] pull CDs from the rack, and he didn't spend much time looking at titles or prices or anything." Howison testified that she saw Mr. Niessel for the first time "seconds before" he selected a CD. Howison then observed Mr. Niessel turn around and leave the aisle immediately.
Howison asked Sandra McRoberts, a Meijer store detective, to turn the camera to the front doors. Howison testified that when a customer leaves the aisle, he leaves the view of the camera. The next time she saw Mr. Niessel on the video, he was walking past the greeter and exiting the front door of the store. Howison saw the bag but did not see the C.D. Mr. Niessel had selected. When asked how much time elapsed between when she viewed Mr. Niessel in the C.D. aisle and when she saw him on the exit monitors, Howison replied, "a minute to 2 minutes." Howison admitted that she did not know where Mr. Niessel was in the store during that time.
After Mr. Niessel exited the store, Howison walked out to the parking lot. Howison testified that she saw Mr. Niessel walk to the passenger side of his vehicle, open the door, and place the bag he was carrying inside. Howison still could not determine whether the bag was a Meijer bag. Mr. Niessel walked around to the driver's side and got in the vehicle. Mr. Niessel backed out of the parking space and drove towards the entrance on Towne Boulevard. He then stopped the vehicle in an unoccupied area of the parking lot and reached towards the passenger side of the vehicle.
Howison wrote down the license plate number of Mr. Niessel's vehicle. Howison testified that she talked to McRoberts on a cell phone and told her that Mr. Niessel had moved his vehicle. Howison testified that McRoberts asked her if she wanted her to call the Middletown Police Department to investigate. Howison testified that she gave McRoberts the license plate number of Mr. Niessel's vehicle. When asked why she gave McRoberts the license plate number, Howison testified that the information would "help the investigation." Howison testified that she did not tell McRoberts to call the police and that McRoberts did not tell her that she had decided to call the police. However, Howison testified that she heard "bits and parts" of McRoberts' call to the police and heard her "talking to the police about coming out to the store." After the call, Howison waited for the police in the parking lot. In her affidavit, Howison stated, "Meijer did not request the police to stop [Mr. Niessel's] vehicle or to detain or arrest [Mr. Niessel] at that time [of the call to police]. Meijer simply notified the police for assistance in investigating, detecting and/or prevention of a possible shoplifting incident."
McRoberts was also deposed. McRoberts testified that Howison was her supervisor on December 9, 1998. McRoberts testified that she was sitting in the monitor room with Howison that day when Howison said that she had seen Mr. Niessel
 in the C.D. aisle, and he had a bag and had selected some CDs. And then [Howison] ran out of the room and asked me to watch him on the monitor, and I was watching him on the monitor. A minute later I had him on the monitor going out the front door on the south end. She was out on the floor already, watching him.
McRoberts testified that she had not been watching the monitors before Howison told her to watch Mr. Niessel. McRoberts observed a bag in Mr. Niessel's hand but could not determine whether or not it was a Meijer bag. McRoberts noticed that Mr. Niessel left the C.D. aisle quickly.
During the deposition of McRoberts the following exchanged occurred:
Q. Did you see any CDs in his hands?
A. I couldn't tell. It was very quick.
 Q. Was he facing the C.D. counter or just walking through an aisle?
 A. He walked into the C.D. aisle, and then he walked and placed something down and walked back out, or picked something up. I couldn't tell what it was.
 Q. But you could see him it wasn't just him walking with a bag; you saw him do something at the C.D. aisle?
 A. Correct. He stopped at an area and did something with the CDs, and then walked back out.
 Q. Do you believe he was putting the C.D. back?
A. I don't know what he was doing.
Q. Do you believe he was taking a C.D. out?
A. I don't know what he was doing.
 Q. As he came away from the display, did you see anything in his hands other than the bag?
 A. I couldn't see anything about the bag. It was real [sic] big, and that's all I could see. It was a little bit blurry.
* * * *
 Q. So he leaves the aisle, you lose sight of him * * * for one minute?
 A. Yes, it was, well, about a minute and a half from the time he left that aisle to the time he walked out the lobby.
McRoberts also admitted that she did not have any knowledge of what happened during the time that she lost sight of Mr. Niessel.
After Mr. Niessel left the store, McRoberts viewed him on a video of the parking lot. McRoberts further testified, "While [Mr. Niessel] was in the parking lot, [Howison] called me on our cell phones, and we talked, and I asked her did she want me to call the police. She said yes, so I did." McRoberts testified that she talked to a dispatcher and requested that an officer respond to a suspicious situation at the store. McRoberts testified, "I believe I told her that [Mr. Niessel] had been in our C.D. aisle with a big bag, and he left our store, and that he was in the parking lot." McRoberts testified that she gave the dispatcher a description of Mr. Niessel's vehicle but that she does not recall whether she supplied a license plate number.
Howison testified that after waiting a while for the police to arrive, she walked back to the monitor room and talked to McRoberts. Howison then received a call from the police dispatcher and was advised that the suspect had been apprehended and had Meijer merchandise in his possession. The police requested that a Meijer representative drive to the scene of the stop to identify the merchandise. McRoberts testified that "I think we were both kind of surprised they had stopped him, because we thought they were coming to the store, which is what they normally do, is they just come to the store and talk to us." Howison arrived with McRoberts. McRoberts testified that she shook hands with one of the officers there who was a friend of hers. Howison was asked to identify CDs found in Mr. Niessel's vehicle. None of the CDs were wrapped in cellophane and none could be identified as Meijer merchandise.
Officers Jerry Mossman and Chris Alfrey, who were two of the police officers at the scene of the stop that day, were also deposed. Officer Mossman testified that the dispatcher said that a suspect driving a red Blazer with license plate number S258348 had taken "a garbage bag full of stuff" from Meijer. Officer Alfrey testified that he responded promptly because from the dispatcher's words, he had understood that a theft had been committed. Both officers testified that Mr. Niessel was cooperative. Officer Mossman testified that he did not recall Mr. Niessel acting unduly upset or agitated. However, when Officer Alfrey was asked whether Mr. Niessel seemed upset or agitated, Officer Alfrey answered, "I believe so. He didn't do anything wrong and the police [were] stopping him. Yeah, like I would be. Any normal person would."
Lieutenant VanArsdale of the Middletown Police Department testified at deposition that his duties include supervising dispatch. He explained that he listened to the tape of Meijer's call to the police as well as the tape of the radio traffic and prepared a memorandum to Major Mark Hoffman summarizing the contents of these audio recordings. This memorandum was submitted as an exhibit for consideration of the trial court on summary judgment. This memorandum states:
 On 12/9/98, at 1645 hours, Sandra McRoberts of Meijer called the Police Desk and advised in an excited manner ". . . we just had a guy that came out of our store, flying out of our store, out of our tape aisle, with a big black trash bag and he's parked in our parking lot, going through it in a red Blazer and he's got temporary tags, and the tags are S258348." She further advised a description of the subject and gave a location and direction of travel of the vehicle. Dispatcher Barker received this call and advised McRoberts that we would have an officer in route.
* * * *
 While conducting the traffic stop [of Mr. Niessel], Officers asked via radio if there was confirmation on any items being stolen. Officers further asked via radio if any one [sic] could advise the contents of the bag. At this time Meijer was contacted to respond to the scene of the traffic stop. Meijer Loss Prevention Officer Heather Howison responded and advised that they observed Niessel on the cameras rushing out the front of the store after leaving the area of the CDs. She advised that they believed he had CDs with him in his bag. Niessel gave officers consent to search his vehicle. Officers then searched the vehicle and did not locate any items that could be identified as being stolen.
* * * *
 It is clear that the Officers handled this call in a manner consistent with Departmental procedure. With the information the Officers had, they would have been remiss had they not stopped Niessel. (Emphasis added.)
Also from reviewing these tapes, Lt. VanArsdale concluded that Mr. Niessel was probably detained for approximately twenty to twenty-three minutes.
After consideration of the evidence and legal arguments submitted by the parties, the trial court granted summary judgment in favor of Meijer on all claims alleged in the complaint. Appellants filed this appeal, raising three assignments of error for our consideration.
Assignment of Error No. 1:
 THE TRIAL COURT ERRED IN SUSTAINING MEIJER'S MOTION FOR SUMMARY JUDGMENT ON THE CLAIM FOR WRONGFUL DETENTION.
In the first assignment of error, appellants contend that the trial court erred by granting Meijer summary judgment on the false imprisonment claim.
Pursuant to Civ.R. 56(C), a summary judgment is appropriate when (1) there is no genuine issue as to any material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to only one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor. Harless v.Willis Day Warehousing Co. (1978), 54 Ohio St.2d 64, 66. This court reviews a trial court's decision to grant summary judgment de novo.Jones v. Shelly Co. (1995), 106 Ohio App.3d 440, 445.
The party seeking summary judgment bears the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact as to the essential elements of the nonmoving party's claim. Dresher v. Burt (1996), 75 Ohio St.3d 280, 293. "[I]f the moving party has satisfied its initial burden, the nonmoving party has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate shall be entered against the nonmoving party." Id.
This court has previously stated that the requisites for a claim for false imprisonment are (1) the intentional detention of the person and (2) the unlawfulness of the detention. Hodges v. Meijer (1998),129 Ohio App.3d 318, 322. To establish a claim for false imprisonment, one must prove by a preponderance of the evidence that he was intentionally detained or confined without lawful privilege and against his consent. Id. False imprisonment is not concerned with good or bad faith or malicious motive. Rogers v. Barbera (1960), 170 Ohio St. 241,244; Tucker v. Kroger Co. (1999), 133 Ohio App.3d 140, 146; Durbin v.Ohio State Hwy. Patrol (1992), 83 Ohio App.3d 693, 697.
It is uncontroverted that Mr. Niessel was detained within a limited area for an appreciable time and against his consent. Meijer argues that because Mr. Niessel was never detained by Meijer employees, Meijer cannot be liable for false imprisonment.
Private citizens who call upon assistance from law enforcement officers are insulated from tort liability if their request for assistance does not amount to a request for arrest. As the Ninth District Court of Appeals held in White v. Standard Oil Co. (1984), 16 Ohio App.3d 21,22-23:
 Where a private citizen merely summons an officer for assistance because of a disturbance and does not specifically request that the person be arrested nor supply the false information to the police which causes the arrest, the citizen is not liable. The independent determination by the officer to arrest for acts committed in his presence insulates the citizen from liability even though the original summons was without cause or even with malice. 32 American Jurisprudence 2d (1982) 97, False Imprisonment, Sections 42 et seq.; Annotation (1980), 98 A.L.R.3d 542; 1 Restatement of the Law 2d, Torts (1965) 69, Section 45A. Comment c to Section 45A of the Restatement suggests that the procurement of false imprisonment is the equivalent in words or conduct to "Officer, arrest that man!" Id. at 70. See, also, Smith v. District of Columbia (D.C.App. 1979), 399 A.2d 213.
In other words, if Meijer's call to the police was merely a call to aid in the investigation of a potential shoplifting, then Meijer is not liable under the legal theory of false imprisonment. However, if Meijer's call to the police was actually a request to apprehend Mr. Niessel, then Meijer may be held liable for false imprisonment.
In Beverly v. Lawson Co., 1983 WL 4607, (Aug. 18, 1983), Cuyahoga App. No. 45119, unreported, the Eighth District Court of Appeals considered the question of when a private citizen may be held liable for the arrest made by a police officer. The court found that in order to impose liability, it was not necessary that the defendant expressly direct the arrest or be present at the arrest when it is made. Id. at *4. The court concluded:
 In short, the arrest by the officers must be so induced or instigated by the defendant that the arrest is made by the officer, not of his own volition, but to carry out the request of the defendant.* * * * And no liability is incurred if a person merely gives information to an officer tending to show a crime has been committed, and [sic] even if the informer acts maliciously and without probable cause.
Id. Although Beverly involved a lawsuit for false arrest, the court of appeals stated that these standards also apply to an action for false imprisonment. Id.
This case before us today is similar to the facts before the Second District Court of Appeals in Cox v. Kobacker Stores, Inc., 1985 WL 8081, (Aug. 30, 1985), Miami App. No. 85CA2, unreported. In that case, the plaintiff, Cox, sued PicWay Shoe Mart ("PicWay") and its employees, along with two city police officers for false imprisonment. Id. at *1. The employees of PicWay reported a shoplifting to the local police, providing a description of Cox, as well as a description of Cox's vehicle and its license number. Id. Using this information, a police officer went to Cox's residence and told Cox that she was a shoplifting suspect. Id. Cox stated that she had been to the shopping center that day but denied shopping at PicWay. Id. Cox was transported to PicWay in a police cruiser. Id. When a PicWay employee saw Cox, she said that she must have been mistaken about the license plate number. Id. The trial court granted summary judgment in favor of all of the defendants. Id.
In reviewing the case, the appellate court determined that summary judgment was properly given to the police officers, as they had complied with R.C. 2935.041(E).[2] Cox, 1985 WL 8081 at *2. However, the court reversed the trial court's grant of summary judgment to PicWay and its employees. Id. at *3. In so finding, the court rejected PicWay's argument that the detention was lawful because of the provisions of R.C.2935.041(A).[3] Id. at *2. The appellate court reasoned that the statute did not apply where the "detention" occurred one mile from the store, which was not "within the mercantile establishment or its immediate vicinity" as provided in R.C. 2935.041(A). Id. at *3. In reversing summary judgment as to PickWay, the court stated, "We think that the material facts not in dispute in this case are sufficient to support a reasonable inference that Mrs. Phillips intended the police to apprehend an individual with plaintiff's description in an automobile bearing plaintiff's license number." Id. at *2.
We agree that where an employee of a business requests police to apprehend a suspect and an unlawful detention results, the business is not protected from tort liability. To shield businesses from liability solely because police officers were involved would encourage stores to ask police to arrest all suspicious shoppers, even where the circumstances do not demonstrate probable cause that a theft has been committed. This would extend the Ohio's shopkeeper privilege beyond that created by statute. R.C. 2935.041(A) requires that a merchant have probable cause that an item has been unlawfully taken in order to detain a customer.
Viewing the facts and inferences in this case in a light most favorable to appellants, we find that there is a genuine issue of fact as to whether Meijer's call to the Middletown police was a request to apprehend Mr. Niessel. Because there remains to be litigated a genuine issue of fact material to appellants' false imprisonment claim, the trial court erred in granting summary judgment on this issue. The first assignment of error is sustained.
Assignment of Error No. 2:
 THE TRIAL COURT ERRED IN SUSTAINING MEIJER'S MOTION FOR SUMMARY JUDGMENT ON THE CLAIM FOR EMOTIONAL DISTRESS.
In the second assignment of error, appellants insist that granting summary judgment to Meijer on their claims of intentional infliction of emotional distress and negligent infliction of emotional distress was inappropriate. Appellants argue that a jury should have the opportunity to decide to what extent Meijer's conduct caused emotional distress to Mrs. Niessel.
This court has previously examined the elements of emotional distress in detail. In Wilkins v. Ondrovich (1997), 118 Ohio App.3d 93, 97, we explained that intentional infliction of emotional distress occurs where one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another. We further stated the following:
 In order for a plaintiff to recover in an action for intentional infliction of emotional distress, plaintiff must establish the following four elements:
 (1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff;
 (2) that the actor's conduct was so extreme and outrageous as to go "beyond all possible bounds of decency" and was such that it can be considered as "utterly intolerable in a civilized community," Restatement of the Law 2d, Torts (1965) 73, Section 46, comment d;
 (3) that the actor's actions were the proximate cause of plaintiff's psychic injury; and
 (4) that the mental anguish suffered by plaintiff is serious and of a nature that "no reasonable man could be expected to endure it[.]"
In defining "extreme and outrageous" conduct, the supreme court has stated:" `It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has beenfound only where the conduct has been so outrageous in character, and soextreme in degree, as to go beyond all possible bounds of decency, and tobe regarded as atrocious, and utterly intolerable in a civilizedcommunity. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!" (Emphasis added; citations omitted.)
Id. at 97-98.
In the complaint, Mr. Niessel alleges that this incident has caused him to suffer "embarrassment, mental anguish, loss of reputation, loss of self-esteem, harm to [his] relationship with his family, and other emotional distress * * *." There is some evidence on the record demonstrating that Mr. Niessel was upset and agitated by his detention. However, reviewing the circumstances of this case, we cannot say that there is a triable issue of fact as to whether the behavior exhibited by Meijer justifies a claim for intentional infliction of emotional distress. There has not been a demonstration that Meijer's behavior was "so outrageous * * * as to go beyond all possible bounds of decency" or that this behavior was "utterly intolerable in a civilized community." See Wilkins at 97-98.
Appellants have also alleged a claim of negligent infliction of emotional distress. A claim of negligent infliction of emotional distress is limited to instances where a plaintiff has either witnessed or experienced a dangerous accident or appreciated an actual physical peril. See Heiner v. Moretuzzo (1995), 73 Ohio St.3d 80. The evidence does not demonstrate that any dangerous accident or physical peril existed in this case. Therefore, it was not error to grant summary judgment to Meijer on the claim of negligent infliction of emotional distress. The second assignment of error is overruled.
Assignment of Error No. 3:
 THE TRIAL COURT ERRED IN SUSTAINING MEIJER'S MOTION FOR SUMMARY JUDGMENT ON THE CLAIM FOR LOSS OF CONSORTIUM.
In the third assignment of error, appellants assert that it was improper to grant summary judgment to Meijer on Mrs. Niessel's claim of loss of consortium.
"A wife has a cause of action for damages for the loss of the consortium of her husband against a person who negligently injures her husband, which injuries deprive her of the consortium of her husband."Clouston v. Remlinger Oldsmobile Cadillac, Inc. (1970), 22 Ohio St.2d 65, paragraph two of the syllabus. Consortium is composed of society, services, sexual relations and conjugal affection that includes companionship, comfort, love and solace. Id. at paragraph three of the syllabus.
Reviewing the record, we find that there is insufficient evidence in the record to substantiate a claim of loss of consortium. Therefore, the trial court properly granted Meijer summary judgment on this claim. The third assignment of error is overruled.
Based on the foregoing, the trial court's decision to grant summary judgment on the false imprisonment claim is reversed, and this issue is remanded for further proceedings. The trial court's decision to grant summary judgment on the claims of intentional infliction of emotional distress, negligent infliction of emotional distress, and loss of consortium is affirmed.
Judgment affirmed in part, reversed in part, and remanded.
YOUNG, P.J., and WALSH, J., concur.
[1] Pursuant to Loc.R. 6(A), we sua sponte remove this case from the accelerated calendar and place it on the regular calendar for purposes of issuing this opinion.
[2] R.C. 2935.041(E) states, "Any peace officer may arrest without a warrant any person that he has probable cause to believe * * * has committed an unlawful taking in a mercantile establishment. An arrest under this division shall be made within a reasonable time after the * * * unlawful taking."
[3] R.C. 2935.041 states:
 (A) A merchant, or his employee or agent, who has probable cause to believe that items offered for sale by a mercantile establishment have been unlawfully taken by a person, may, for the purposes set forth in division (C) of this section, detain the person in a reasonable manner for a reasonable length of time within the mercantile establishment or its immediate vicinity.